IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

:

SENSORMATIC SECURITY CORP.

:

v.                                      : Civil Action No. DKC 2004-0174

:

SENSORMATIC ELECTRONICS CORP.

:

**MEMORANDUM OPINION**

Presently pending in this breach of contract action are (1) a
motion by Plaintiff Sensormatic Security Corporation ("SSC") to
dismiss or in the alterative for summary judgment on the
counterclaim filed by Defendant Sensormatic Electronic Corporation
("Sensormatic")(papers 37 and 100); (2) a cross-motion by
Sensormatic for summary judgment on its counterclaim (papers 45 and
101); (3) a motion by SSC for partial summary judgment (paper 105);
(4) a motion by Defendant ADT Security Services, Inc. ("ADT"), for
summary judgment on the claim filed against it (paper 107); (5) a
cross-motion by Sensormatic for summary judgment (paper 108); and
(6) three motions to seal documents by SSC, Sensormatic and ADT
(papers 109, 110, 114).  The issues are briefed fully, and the
court now rules pursuant to Local Rule 105.6, no hearing being
deemed necessary.  For the reasons that follow, the court will
grant SSC's motion for summary judgment and deny Sensormatic's
motion for summary judgment on Sensormatic's counterclaim; will
deny SSC's motion for partial summary judgment on its complaint;
will grant in part Sensormatic's motion for summary judgment; and

will grant ADT's motion for summary judgment on the count against it (Count IV).

## I.   Background

This is the second breach of contract action filed by SSC against the defendants, Sensormatic and ADT.  The original action still is pending before this court.[1]  *See Sensormatic Security Corp. v. Sensormatic Electronic Corp.*, DKC 02-cv-1565.  In both of these actions, SSC alleges, *inter alia*, that Sensormatic breached its Franchise Agreement with SSC, and that ADT tortiously interfered with that contract.  SSC claims an exclusive right to sell, lease, distribute, service, repair, and maintain Sensormatic products in Maryland, the District of Columbia, and Virginia ("franchise territory").[2]

The dispute in both cases focuses primarily on what products are within the scope of the Franchise Agreement and who has the right to sell products to certain customers within the franchise territory.  In *Sensormatic I*, the dispute involves two types of products, electronic article surveillance systems ("EAS"), which

---

[1] The court will identify the first lawsuit as *Sensormatic I* and the present lawsuit as *Sensormatic II.*

[2] Section 2 of the Franchise Agreement grants SSC the exclusive rights to lease, sell, distribute, service, repair and maintain Sensormatic security and anti-theft equipment.  Section 9(c) prohibits Sensormatic from competing with SSC in SSC's exclusive franchise territory or from granting "to any third party a franchise or any other right to sell, lease or service Equipment in SSC's territory."  Section 1(d) defines "Equipment" as including "all Detection Devices, Tags, Accessories and Supples."

are used to detect and prevent item-level theft typically at retail stores, and closed circuit television ("CCTV"), which can be used for theft detection in a retail setting as well as in non-retail settings for surveillance purposes.  In *Sensormatic II*, the parties dispute whether radio frequency identification ("RFID") products are within the scope of the Franchise Agreement.[3]

The amended complaint SSC filed in *Sensormatic II* asserts the following: Count I, breach of contract and breach of implied covenant of good faith and fair dealing (failure to provide amendment of franchise agreement); Count II, breach of contract and breach of implied covenant of good faith and fair dealing (refusal to allow SSC to sell RFID products); Count III, breach of contract and breach of implied covenant of good faith and fair

_____

[3] RFID technology is used for identifying products.  An RFID tag "houses a semiconductor chip capable of storing and communicating information.  The chip contains a unique product code (EPC) – effectively a programmable license plate – that uniquely identifies the item to which it is attached.  When energized by the ultra-high-frequency radio wave transmitted by the RFID antenna, the chip sends its identification information to the reader via radio frequency waves."  (Paper 108, at 4-5)(internal citations omitted).

RFID technology primarily is used in supply-chain management. In 2003, Wal-Mart became the first retailer to issue a mandate requiring its one hundred largest suppliers to apply RFID tags to pallets and cases of goods shipped to distribution centers. "The predominate benefits that these retailers hope to achieve from implementing RFID technology are to reduce out-of-stocks on retail shelves by improving inventory visibility throughout the supply chain, to reduce supply chain shipping and receiving costs by facilitating data collection, and in the more distant future, to improve customer service by better understanding customer behavior."  (Paper 108, Dunn dec., ¶ 3).

dealing (for authorizing ADT to sell and service Sensormatic access control and RFID products and systems within SSC's territory); Count IV, tortious interference with contract against ADT. (Paper 18). Sensormatic has filed a counterclaim that seeks the following: a declaratory judgment "confirming that it has the right under the Franchise Agreement to terminate the Franchise Agreement and pay the payments provided for by Section 1 of the Dealer's Release Agreements 'in full satisfaction of any claim (other than for monies due as a result of operations of the franchise prior to such termination) which the Franchisee may have or assert arising from the termination of [the Franchise] Agreement.'" (Paper 33, ¶ 15).

On August 10, 2004, the court issued an Order dismissing Count I of the amended complaint and dismissing the portion of Count III dealing with access control devices. (Paper 30). Since then, the parties have filed the following motions. SSC moves to dismiss Sensormatic's counterclaim on the ground that it is barred by the doctrines of res judicata and collateral estoppel. In the alternative, SSC seeks summary judgment on the counterclaim on the ground that Sensormatic cannot terminate the Franchise Agreement without cause. (Paper 37). Sensormatic has cross-moved for summary judgment on its counterclaim. (Paper 45). SSC has moved for partial summary judgment with respect to Count II on the grounds of collateral estoppel and the language in the contract.

4

(Paper 105).  Sensormatic has cross-moved for summary judgment on all counts. (Paper 108).  ADT has moved for summary judgment on Count IV, the only count brought against it.  (Paper 107).

## II.  Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979).  The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he or she is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592,

595 (4th Cir. 1985).  A party that bears the burden of proof on a particular claim must factually support each element of its claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323.  Summary judgment will not be appropriate unless the movant's evidence supporting the motion "demonstrate[s] an absence of a genuine dispute as to every fact material to each element of the movant's claim and the non-movant's response fails to raise a genuine issue of material fact as to any one element." *McIntyre v. Robinson*, 126 F.Supp.2d 394, 400 (D.Md. 2000) (internal citations omitted).  On those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial.  *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324.  However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810 (1997).  There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

When faced with cross-motions for summary judgment, as in this case, the court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted). *See also havePOWER, LLC v. Gen. Electric Co.*, 256 F.Supp.2d 402, 406 (D.Md. 2003) (citing 10A Charles A. Wright and Arthur R. Miller, Federal Practice & Procedure § 2720 (3d ed. 1983)). The court reviews each motion under the familiar standard for summary judgment, *supra*. The court must deny both motions if it finds there is a genuine issue of material fact, "[b]ut if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Federal Practice & Procedure § 2720.

**III. SSC's Motion to Dismiss or in the Alternative for Partial Summary Judgment on Sensormatic's Counterclaim**

In *Sensormatic I*, Sensormatic sought a declaratory judgment that the Franchise Agreement is a contract of indefinite duration, and therefore, is terminable at will upon giving reasonable notice. The court denied the motion, and held that the "the contract was not to be terminable at will by the franchisor, but rather was terminable only upon the happening of some objectively verifiable event." *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 249 F.Supp.2d 703, 715 (D.Md. 2003). In *Sensormatic II*, Sensormatic seeks a declaration that it can terminate the Franchise Agreement

7

"for any reason whatsoever" and make payments as specified in §
12.H in full satisfaction of any claims SSC may have arising from
the termination.  (Paper 45, at 1).  SSC asserts that because the
court previously ruled on essentially the same issue in *Sensormatic
I*, the doctrines of res judicata and collateral estoppel preclude
Sensormatic from relitigating the asserted grounds for terminating
the Franchise Agreement.  (Paper 38, at 7).

Under the doctrine of *res judicata*, a party may not seek to
litigate, in a new action, claims that were or could have been
raised in an earlier action between the parties or their privies
that was resolved on the merits:

> Under the doctrine of res judicata, "a final
> judgment on the merits bars further claims by
> parties or their privies based on the same
> cause of action." *Montana v. United States*,
> 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d
> 210 (1979). . . .  "To establish a res
> judicata defense, a party must establish: (1)
> a final judgment on the merits in a prior
> suit, (2) an identity of the cause of action
> in both the earlier and the later suit, and
> (3) an identity of parties or their privies in
> the two suits." *Jones v. SEC*, 115 F.3d 1173,
> 1178 (4th Cir. 1997) (internal quotation marks
> omitted), *cert. denied*, 523 U.S. 1072, 118
> S.Ct. 1512, 140 L.Ed.2d 666 (1998).

*Andrews v. Daw*, 201 F.3d 521, 524 (4th Cir. 2000).

Collateral estoppel, by contrast, prevents "the relitigation
of issues of fact or law that are identical to issues which have
been  actually  determined  and  necessarily  decided  in  prior
litigation in which the party against whom [issue preclusion] is

8

asserted had a full and fair opportunity to litigate." *Ramsay v. U.S. Immigration & Naturalization Serv.*, 14 F.3d 206, 210 (4th Cir. 1994) (quoting *Va. Hosp. Ass'n. v. Baliles*, 830 F.2d 1308, 1311 (4th Cir. 1987)).  When a party asserts the doctrine, it must establish the following elements:

> (1) the issue precluded must be identical to one previously litigated;
> (2) the issue must have been actually determined in the prior proceeding;
> (3) determination of the issue must have been a critical and necessary part of the decision in the prior proceeding;
> (4) the prior judgment must be final and valid; and
> (5) the party against whom estoppel is asserted must have had a full and fair opportunity to litigate the issue in the previous forum.

*Ramsay*, 14 F.3d 206 at 210. *See also Sedlack v. Braswell Servs. Group, Inc.*, 134 F.3d 219, 224 (4th Cir. 1998).

With respect to the first element of res judicata (finality), SSC asserts that the partial summary judgment in *Sensormatic I* in its favor on Sensormatic's counterclaim is a final judgment on the merits for purposes of res judicata.  (Paper 27, at 8).  Although the United States Court of Appeals for the Fourth Circuit has recognized that a summary judgment is a final disposition on the merits, *see Adkins v. Allstate Ins. Co.*, 729 F.2d 974, 976 n.3 (4th Cir. 1984), it has not directly ruled on the issue of whether a

*partial* summary judgment also is final for res judicata purposes.[4]

The Fourth Circuit has stated that:

> [A]n order of partial summary judgment is interlocutory in nature. *See, e.g.,* 11 Moore's Federal Practice § 56.40[3] (Matthew Bender 3d ed.) ("A partial summary judgment order is interlocutory . . . ."). Motions for reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment. *See* 12 Moore's Federal Practice § 60.23 ("Rule 60(b) does not govern relief from interlocutory orders . . . ."). *This is because a district court retains the power to reconsider and modify its interlocutory judgments, including partial summary judgments, at any time prior to final judgment when such is warranted. See Fayetteville Investors v. Commercial Builders, Inc.,* 936 F.2d 1462, 1469 (4th Cir. 1991) ("An interlocutory order is subject to reconsideration at any time prior to the entry of a final judgment."); *cf.* Fed.R.Civ.P. 54(b) (providing that interlocutory orders that resolve fewer than all claims are "subject to revision at any time before the entry of [final] judgment"). Said power is committed to the discretion of the district court, *see Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 12, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (noting that "every order short of a final decree is subject to

---

[4] The court previously held that the Order was final for purposes of appeal. *See Sensormatic Security Corp. v. Sensormatic Electronics Corp. (Sensormatic I),* 2004 WL 86179, at * 5 (D.Md. Jan. 20, 2004). However, courts apply different standards of finality for purposes of appeal and res judicata. *See Hooks v. Hooks,* 771 F.2d 935, 948 (6th Cir. 1985); 18A Charles A. Wright and Arthur R. Miller, Federal Practice & Procedure § 4432 (3d ed. 2002)("Despite this overlap in the purposes of requiring finality for appeal and for preclusion, it is clear that definitions of finality cannot automatically be carried over from appeals cases to preclusion problems.")

> reopening at the discretion of the district
> judge") . . .

*Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (4th
Cir. 2003)(emphasis added).  *See also Norritech v. Geonex Corp.*,
204 B.R. 684, 689 (D.Md. 1997)("Because partial summary judgment on
liability only lacks finality it has no preclusive effect.");
*Avondale Shipyards, Inc. v. Insured Lloyd's*, 786 F.2d 1265, 1270
(5th Cir. 1986)(stating that "partial summary judgment orders lack
the finality necessary for preclusion"). *Cf. Jaindl v. Wright*, 952
F.2d 1396, 1992 WL 6831, at *1 (4th Cir. Jan. 21, 1992)("The grant
of partial summary judgment by the district court presents no res
judicata concerns.").  Thus, the court's holding in *Sensormatic I*
is not final for purposes of res judicata, and res judicata does
not apply to bar Sensormatic's current counterclaim.

In the alternative, SSC has asserted collateral estoppel.  SSC
cannot satisfy, at minimum, the first two elements of collateral
estoppel: the issue precluded is identical to one previously
litigated and the issue must have been actually determined in the
prior proceeding.[5]  In *Sensormatic I*, Sensormatic unsuccessfully

---

[5] Because SSC cannot satisfy the first two elements, the court
does not reach the element of finality for collateral estoppel,
which differs from finality for purposes of res judicata. *See*
*Christo v. Padgett,* 223 F.3d 1324, 1339 (11th Cir. 2000)("It is
widely recognized that the finality requirement is less stringent
for issue preclusion than for claim preclusion.")(citing *Miller*
*Brewing Co. v. Jos. Schlitz Brewing Co.*, 605 F.2d 990, 996 (7th Cir.
1979); *Lummus Co. v. Commonwealth Oil Refining Co.*, 297 F.2d 80, 89
(2nd Cir. 1961); Restatement (Second) Judgments § 13 (1980); 18
(continued...)

sought a declaratory judgment that the Franchise Agreement is terminable at will.   In *Sensormatic II*, Sensormatic seeks a declaratory judgment that it can terminate the Franchise Agreement "for any reason whatsoever" and make certain payments in satisfaction of any SSC claims for termination.   The Restatement (Second) of Judgments notes that:

> One of the most difficult problems in the application of [Issue Preclusion] is to delineate the issue on which litigation is, or is not, foreclosed by the prior judgment.  The problem involves a balancing of important interests: on the one hand, a desire not to deprive a litigant of an adequate day in court; on the other hand, a desire to prevent repetitious litigation of what is essentially the same dispute.  When there is a lack of total identity between the particular matter presented in the second action and that presented in the first, there are several factors that should be considered in deciding whether for purposes of the rule of this Section the "issue" in the two proceedings is the same, for example:  Is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first?  Does the new evidence or argument involve application of the same rule of law as that involved in the prior proceeding? Could pretrial preparation and discovery relating to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second?  How closely related are the claims involved in the two proceedings?

--------

[5](...continued)
Charles Alan Wright et al., Federal Practice and Procedure § 4434 at 110 (2002).

Restatement (Second) of Judgments, § 27, cmt. c (1982).  These
factors weigh in favor of a finding that the issues are different.
First, the arguments do not substantially overlap.  The arguments
in *Sensormatic I* focused on the duration of the contract and
whether the Franchise Agreement was of indefinite duration.
*Sensormatic*, 249 F.Supp.2d at 712.  Here, the arguments pertain to
the circumstances upon which Sensormatic may terminate the
Franchise Agreement (i.e., whether Sensormatic can terminate "for
any reason whatsoever" by invoking what Sensormatic identifies as
a liquidated damages provision).  (Paper 45, at 6).  Second, these
arguments involve interpretations of different rules of law.
*Sensormatic I* applied the law involving contracts of indefinite
duration.  *Sensormatic*, 249 F.Supp.2d at 713-15.  Here, the area of
law to be applied is based on contract interpretation.  The factor
of whether the claims are closely related is a closer call: Both
claims involve Sensormatic's attempt to terminate the Franchise
Agreement, although *Sensormatic I* focused on the duration of the
Franchise Agreement, while *Sensormatic II* focuses primarily on §
12.H and the grounds for termination.

With respect to the second element of collateral estoppel,
"[a] judgment is not conclusive in a subsequent action as to issues
which might have been but were not litigated and determined in the
prior action."  Restatement (Second) Judgments § 27 cmt. e.  The
issue of whether Sensormatic could terminate the Franchise

Agreement "for any reason whatsoever" so long as Sensormatic satisfied certain payments in § 12.H was not actually determined in *Sensormatic I*.  Indeed, the court did not rule specifically on the grounds upon which Sensormatic may terminate the Franchise Agreement.  The court stated:

> [T]he termination provisions in this contract are much more definite and objective.  First of all, the franchisee has the right to terminate at will, upon giving 60 days notice. On the other hand, the franchisor's right to terminate rests upon some objective sign of the franchisee's failure, either failure to perform or to be economically unable to perform.  These provisions unquestionably indicate that the contract was not to be terminable at will by the franchisor, but rather was terminable only upon the happening of some objectively verifiable event. Accordingly, this is not a contract of indefinite duration and Sensormatic may not terminate it upon giving reasonable notice.

*Sensormatic I,* 249 F.Supp.2d at 715.  Thus, the court was not asked to decide, nor did it decide, whether Sensormatic could terminate the Franchise Agreement "for any reason whatsoever" if it paid liquidated damages.  *See Sedlack,* 134 F.3d at 224 (stating that because the Administrative Law Judge made no findings on the issue of whether an accident was work-related, the issue was not decided and collateral estoppel did not apply); *N.L.R.B. v. Babad,* 785 F.2d 46, 49 n.4 (2nd Cir. 1986)(finding no collateral estoppel where the previous court "did not decide, and did not need to decide, whether J.R.R. was bound by the other provisions of the labor contract").

Because SSC has failed to satisfy its burden for asserting res judicata and collateral estoppel, the court will reach the merits of whether Sensormatic may terminate the Franchise Agreement "for any reason whatsoever" and that it may do so if it makes certain payments prescribed in § 12.H.

The parties agree that Florida law governs the Franchise Agreement.[6]   The Supreme Court of Florida has stated that "[o]rdinarily the interpretation of a written contract is a matter of law to be determined by the court." *DEC Elec., Inc. v Raphael Constr. Corp.*, 558 So.2d 427, 428 (Fla. 1990); *see also Peacock Constr. Co. v. Modern Air Conditioning, Inc.*, 353 So.2d 840, 842 (Fla. 1977). "[C]ontract language that is unambiguous on its face must be given its plain meaning." *Green v. Life & Health of Am.*, 704 So.2d 1386, 1391 (Fla. 1998).   Moreover, courts must "read provisions of a contract harmoniously in order to give effect to all portions thereof." *City of Homestead v. Johnson*, 760 So.2d 80, 84 (Fla. 2000).

The Franchisee Agreement provides, in pertinent part:

> 12. Duration and Termination of Agreement
>
> A.   Unless   sooner   terminated   by   mutual agreement of the parties hereto or as provided in this Section 12, and except as otherwise expressly provided herein, this Agreement and the franchise shall continue in full force and

---

[6] Section 25 of the Franchise Agreement provides that "[t]his Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Florida."

effect so long as the Franchisor shall be engaged in the business of manufacturing and marketing Equipment.

B.   The Franchisee shall have the right, at its option, to terminate this Agreement and the franchise at any time by giving written notice to the Franchisor of such termination at least sixty (60) days prior to the effective date of such termination.

C.   The Franchisor shall have the right, at its option, to terminate this Agreement and the franchise:

   (i) if the Franchisee shall have failed for any period of three consecutive marketing years of the Franchisor, commencing as of December 1, 1975, on a cumulative basis, to meet the quota provided for in Section 5 (e) hereof to the extent of at least 50% of such quota, by giving written notice to the Franchisee of such termination at any time within sixty (60) days after such three year period, which termination shall be subject to the provisions of paragraph D of this Section 12; or

   (ii) if any one or more of the following events shall have occurred and be continuing (whatever the reasons for such event) by giving written notice to the Franchisee of such termination:
      a. if the Franchisee shall default in the performance or observance of any covenant or condition contained in 6(b) hereof;
      b. if the Franchisee shall default in the performance or observance of any other covenant or condition contained in this Agreement and such default shall have continued for a period of thirty (30) days after written notice thereof has been given to the Franchisee by the Franchisor;
      c.  if the Franchisee becomes insolvent, or makes an assignment for the benefit of creditors, or if proceedings in voluntary bankruptcy are instituted on behalf of the Franchisee or proceedings in involuntary

16

bankruptcy are instituted against the Franchisee, or if the Franchisee shall be adjudicated bankrupt, or if a receiver or trustee of the Franchisee's property shall be appointed; or

d.   If the Franchisee ceases to continue in the business of selling, leasing, servicing, repairing and maintaining Equipment, as contemplated by this Agreement. Any termination of this Agreement by the Franchisor pursuant to this Section 12 shall be in addition to and shall not be exclusive of any rights or remedies the Franchisor may have on account of any default of the Franchisee. No course of dealing between the Franchisor and the Franchisee or any delay or failure on the part of the Franchisor in exercising any rights or remedies hereunder or otherwise shall be considered as a waiver of any rights or remedies of the Franchisor.

D. . . .

E. . . .

F. . . .

G. . . .

H.   The termination of this Agreement for any reason whatsoever shall not terminate the obligations of the parties hereto under a Franchisee's Release Agreement - Option Three, previously entered into by the parties hereto and, in particular, shall not terminate the obligation of the Franchisor to make the payments provided for in Section 1 thereof, which payments as provided therein, together with any consideration provided, for in paragraph D(ii) of this Section 12, are deemed to be in full satisfaction of any claim (other than for monies due as a result of operations of the franchise prior to such termination) which the Franchisee may have or assert arising from the termination of this agreement.

17

SSC asserts that Sensormatic has the right to terminate the
Franchise Agreement only upon the occurrence of the five
circumstances list in subsection C, and therefore, Sensormatic
cannot terminate the agreement "for any reason whatsoever." (Paper
37, at 16-17).  The language "for any reason whatsoever" used in
subsection H is "simply a shorthand means of referring to the
grounds for termination [by either party] provided in Sections
12.A, 12.B and 12.C." *Id.* at 18.

Sensormatic contends that the plain meaning of "for any reason
whatsoever" encompasses all reasons, including reasons with and
without cause.  (Paper 45, at 7).  Sensormatic offers three
arguments in support.  First, the plain meaning of the phrase "for
any reason whatsoever" means all reasons, with or without cause.
Second, Sensormatic argues that SSC's narrow reading would
frustrate the purpose of § 12.H, which Sensormatic asserts is a
liquidated damages clause.  Finally, Sensormatic contends that
SSC's reading of the language "for any reason whatsoever" cannot be
reconciled with the use of the same phrase "for any reason
whatsoever" used in § 5.L.

Sensormatic's arguments are unpersuasive when § 12 is read in
its entirety.  Subsection 12.A. provides that "[u]nless sooner
terminated by mutual agreement of the parties hereto or as provided
in this Section 12, and except as otherwise expressly provided
herein, this Agreement and the franchise shall continue in full

18

force and effect so long as the Franchisor shall be engaged in the business of manufacturing and marketing Equipment." Thus, the Franchise Agreement binds the parties unless: (1) the parties mutually agree to terminate the Franchise Agreement; (2) as provided in § 12; or (3) if Sensormatic no longer manufactures and markets Equipment. Specific grounds for termination are identified in sections 12.B (SSC's right to terminate) and 12.C (Sensormatic's right to terminate). Sensormatic's argument that it may terminate the contract "for any reason whatsoever" conflicts with §§ 12.A, 12.B, and 12.C.

Sensormatic's assertion that § 12.H is a liquidated damages clause also conflicts with the language in § 12.A. This section envisions a contract with limited and specific rights of termination. Sensormatic's assertion that § 12.H is a liquidated damages clause and therefore Sensormatic can terminate the Franchise Agreement "for any reason whatsoever" is inconsistent with §§ 12.A, 12.B, and 12.C. Rather, a better reading of § 12.H is that the parties wished to ensure that, if the Franchise Agreement was terminated under the conditions specified in § 12, SSC would continue to receive certain fees from the the Dealer Release Agreement, as well as fees from § 12.D(ii), if applicable.

The cases cited by Sensormatic do not alter this conclusion. For instance, Sensormatic cites several cases stating that the words "for any reason whatsoever" mean all reasons. In *Terranova*

*Corp. v. 1550 Biscayne Assocs., Corp.*, 847 So.2d 529, 531 (Fla.Dist.Ct.App. 2003), the contract at issue stated that the agreement "may be terminated for any reason whatsoever." The contract, however, did not appear to include any provisions identifying specific grounds for termination, unlike the Franchise Agreement. Similarly, in *Knudsen v. Northwest Airlines, Inc.*, 450 N.W.2d 131, 132 (Minn. 1990), the contract provided that if the employee ceased to be a management employee "for any reason," certain stock options could be exercised by the employee. The court read "for any reason" broadly, however, there was no indication in the facts that the contract included any specific reasons for termination.

Another case Sensormatic cites, *Sulzer Carbomedics, Inc. v. Or. Cardio-Devices, Inc*. 257 F.3d 449 (5th Cir. 2001), also is distinguishable. In *Sulzer*, the contract at issue stated that if a party availed itself of its right to terminate the contract, it would not be liable to the other party for "loss, damage, indemnity, cost, expense, or thing of any kind or nature whatsoever, and any and all claims of such liability and the right to make such claim are . . . expressly waived." *Id*. at 451. The contract further provided that neither party would be liable for damages "for the [lawful] termination or cancellation for any reason whatsoever." *Id*. The issue before the district court and the United States Court of Appeals for the Fifth Circuit was

20

whether the defendant, who breached the contract, was liable for damages.   The plaintiff contended that there was no waiver of damages unless the termination provisions in the contract were followed.   The court ruled in favor of the defendant, holding that the terms of the contract were clear and that the defendant was not liable for damages for early termination.   *Id.* at 457.   *Sulzer* is not entirely on point because the issue before the district and appellate courts was whether the defendant was liable for damages, not whether the contract allowed the defendant to terminate the contract "for any reason whatsoever."   In addition, the broad reading of the phrase "for any reason whatsoever" by the district and appellate courts was consistent with the contract as a whole because the contract expressly stated that if a party availed itself of the right to terminate, it would not be liable to the other for "loss, damage, indemnity, cost, expense or thing of any kind or nature whatsoever, and any and all claims of such liability and the right to make such claims are . . . expressly waived." Here, the Franchise Agreement envisions a more limited right to terminate based on specific grounds.

     Accordingly, the court will deny Sensormatic's motion for summary judgment on its counterclaim in which it requests a declaratory judgment "confirming that it has the right under the Franchise Agreement to terminate the Franchise Agreement and pay the payments provided for by Section 1 of the Dealer's Release

Agreements 'in full satisfaction of any claim (other than for monies due as a result of operations of the franchise prior to such termination) which the Franchisee may have or assert arising from the termination of [the Franchise] Agreement.'" (Paper 33, ¶ 15). Instead, SSC's motion for summary judgment will be granted on the counterclaim.

**IV.  SSC's Motion for Partial Summary Judgment, Sensormatic's Cross-motion for Summary Judgment, and ADT'S Motion to Dismiss Count IV.**

**A.  Collateral Estoppel**

SSC contends that the issue of whether RFID products are within the scope of the Franchise Agreement was litigated previously in the United States District Court for the Western District of Pennsylvania in another dispute between Sensormatic and a franchisee for the Pennsylvania-Delaware region ("Pennsylvania franchise").  SSC asserts that the decision of the Pennsylvania court, which was affirmed by the United States Court of Appeals for the Third Circuit, is binding on Sensormatic as a matter of collateral estoppel.  (Paper 106, at 17).  Sensormatic responds that collateral estoppel is inapplicable because (1) the issues in the Pennsylvania case and the present case are different and (2) the issues in the present case were not actually litigated in the Pennsylvania case.

In *Sensormatic Electronics Corp v. First National Bank of Pennsylvania*, 99 cv 756 (W.D.Pa. May 13, 2005), Judge Schwab issued

a Memorandum Opinion and Order that addressed, *inter alia*, the scope of the franchise agreement between Sensormatic and the franchisee for the Pennsylvania-Delaware region, Winner & Bagnara, Inc. ("Winner"). The Winner franchise agreement, dated November 30, 1978, was identical to the Franchise Agreement in the present lawsuit, except that it included an addendum ("Winner addendum") also signed on November 30, 1978. The Winner addendum amended the definition for Detection Devices and Automatic Theft Detection Uses. The addendum provided:

> "Detection Devices" shall also mean and include detection systems and devices similar to the detection systems and devices presently being marketed by the Franchisor for Automatic Theft Detection Uses and embodying the same technology, but specifically designed for Other Surveillance uses. "Automatic Theft Detection uses" shall also mean and include article surveillance uses other than the prevention and detection of shoplifting and other theft (e.g., personnel identification card detection), which other uses are sometimes herein referred to as "other Surveillance Uses".

Like the parties in the present lawsuit, the parties in the Pennsylvania case disagreed about whether certain products were included in the franchise agreement. Sensormatic argued that the products within the franchise agreement were limited to those with microwave-based technology and those that succeeded the Sensormatic System, which was specifically identified in the Franchise

Agreement's definition for Detection Devices in § 1(a).[7]  Winner argued that the scope of the Franchise Agreement was based on the product's use, i.e., the way in which the customer used the product.

The Pennsylvania court agreed with Winner that the scope of the agreement was determined by the product's use. (Paper 106, ex. SS, at 13).  The court held that the franchise included all product lines "use[d] for the prevention and detection of shoplifting and other theft."  *Id*. at 18 (quoting the franchise agreement) (internal quotation marks omitted).  The court further held that RFID products were within the scope of the franchise.  *Id*. at 19. The United States Court of Appeals for the Third Circuit affirmed the district court's ruling.  *See Sensormatic Elecs. Corp. v. First Nat'l Bank Pa.*, 148 Fed.Appx. 99, 105 (3rd Cir. 2005) (unpublished) (recognizing a "'use' based definition").

---

[7]     Section 2 states that the Franchisor grants to the Franchisee "an exclusive franchise to lease, sell and/or otherwise distribute, and service, repair and maintain, in the Franchisee's Territory, Detection Devices, Tags, Accessories and Supplies for Automatic Theft Detection Uses . . . ."

    Section 1(a) defines detection devices as "the detection systems and devices presently being marketed by the Franchisor for Automatic Theft Detection Uses (known as the Sensormatic System, and including the Double Checker), which include a transmitter and coordinated receiver and alarm console, and which may be installed and used as a system or device to activate and detect Tags, sounding an alarm or otherwise activating a control device, and all successors thereto."

Sensormatic asserts that collateral estoppel does not apply because the contracts at issue differed due to the Winner addendum, which expanded the definition for "Automatic Theft Detection Uses." Sensormatic contends that the Pennsylvania court relied on the Winner addendum in reaching its decision. (Paper 108, at 14). The court disagrees. The Pennsylvania court did not rely on the Winner addendum, but rather cited it to show that Sensormatic knows how to include certain limiting language in its contract. *See* (paper 106, ex. SS, at 18)("If the Franchisor wanted a 'technology' limitation (which as stated above would greatly reduce the value of the Franchise), the Franchisor should have placed such limitation in the Restated Franchise Agreement, as it did in the Addendum.").

Sensormatic next argues that collateral estoppel is inappropriate where the controlling facts have changed, and in this case, the uses for RFID technology have changed. There is case law to support this argument. *See Faulkner v. Nat'l Geographic Enter. Inc.*, 409 F.3d 26, 37 (2nd Cir. 2005)("Use of collateral estoppel 'must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged.'")(quoting *Comm'r of Internal Revenue v. Sunnen*, 333 U.S. 591, 599-600 (1948)); *Cmty. Hosp. v. Sullivan*, 986 F.2d 357, 360 (10th Cir. 1993) ("The Government also correctly asserts that collateral estoppel is inapplicable because both the

facts and the law in this action are substantially different from those at issue in St. Mary's.")(citing *Comm'r of Internal Revenue*, 333 U.S. at 599-601); *Clark v. Troutman*, 502 A.2d 137, 140-41 (Pa. 1985)(stating that collateral estoppel "is not meant to create vested rights in decisions that have become obsolete or erroneous with time, thereby causing inequities . . . It must be confined to situations where . . . the controlling facts and applicable legal rules remain unchanged . . . . [A] judicial declaration intervening between the two proceedings may so change the legal atmosphere as to render the rule of collateral estoppel inapplicable."))(quoting *Comm'r of Internal Revenue*, 333 U.S. at 599-600).

Sensormatic's better argument, however, is that the issue of whether the RFID products involved there were within the scope of the Franchise Agreement was not actually litigated in the Pennsylvania case because Sensormatic did not contest that the RFID products were an Automatic Theft Detection product.[8]  An issue is not actually litigated for purposes of collateral estoppel if a party concedes the issue.  *See, e.g., Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 146 (2nd Cir. 2005)(stating that "[m]ost courts have held that a fact established in prior litigation by stipulation, rather than by judicial resolution, has not been

_____

[8] Specifically, according to the court's opinion, Sensormatic argued that "with the exception of the other electronic article surveillance systems and RFID, none of them are even products for Automatic Theft Detection."  (Paper 106, ex. SS, at 12).

"actually litigated"); *United States v. Botefuhr*, 309 F.3d 1263, 1282 (10th Cir. 2002)(stating that an issue is not actually litigated "if it is the subject of a stipulation between the parties")(quoting Restatement (Second) of Judgments); *United States v. Kasler Elec. Co., Inc.*, 123 F.3d 341, 350 (6th Cir. 1997)(stating that an issue is not actually litigated "if it is the subject of a stipulation between the parties."); *Lebeau v. Lebeau*, 393 A.2d 480, 483-84 (Pa.Super.Ct. 1978)("An issue is not actually litigated if the defendant might have interposed it as an affirmative defense, but fails to do so; nor is it actually litigated if it is raised by a material allegation of a party's pleading but is admitted (explicitly or by failure to deny); nor is it actually litigated if it is the subject of a stipulation between the parties."(quoting Restatement (Second) Judgments, § 68 cmt. e).

In its reply, SSC appears to argue that the issue was actually litigated because to reach its conclusion, the Pennsylvania court had to consider both whether an RFID product was used for automatic theft detection uses and whether an RFID product is a successor to the Sensormatic System in order to reach the conclusion that RFID is within the scope of the franchise agreement.  (Paper 111, at 20).  First, the Pennsylvania court did not expressly make this analysis.  Second, even if the Pennsylvania court did make this analysis, that does not mean that the issue was actually litigated. SSC presents no memorandum or other evidence to demonstrate that

Sensormatic made specific arguments as to whether the RFID products were used for automatic theft detection uses and that it was a successor product.  Finally, SSC is raising a new argument for the first time in its reply memorandum, and the court "need not consider an argument raised for the first time in a reply brief." *United States v. Smith*, 44 F.3d 1259, 1266 (4th Cir. 1995).  Thus, because the issue of whether RFID products are for Automatic Theft Detection Uses was not litigated in the Pennsylvania case, SSC has failed to satisfy its burden for asserting collateral estoppel, and therefore, the Pennsylvania decision is not binding on Sensormatic as a matter of collateral estoppel with respect to RFID products.

**B.   The Scope of SSC's Rights with Respect to RFID Systems**

SSC asserts in Counts II, III, and IV that RFID products are within the scope of the Franchise Agreement.  Much of the dispute arises from different interpretations of the language in the Franchise Agreement.

"Language in a document is ambiguous when it is uncertain in meaning and may be fairly understood in more ways than one and is susceptible of interpretation in opposite ways."  *Barnett v. Destiny Owners Ass'n, Inc.*, 856 So.2d 1090, 1092 (Fla.Dist.Ct.App. 2003)(citing *Friedman v. Va. Metal Products Corp.*, 56 So.2d 515, 517 (Fla. 1952)).  The fact that a term is not defined does not automatically make the term ambiguous. *See State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So.2d 1072, 1076 (Fla. 1998) ("The lack

of a definition of an operative term in a policy does not
necessarily render the term ambiguous and in need of interpretation
by the courts."); *Great Am. Ins. Cos. v. Souza*, 855 So.2d 187, 188-
89 (Fla.Dist.Ct.App. 2003)("The failure to define a term does not
in itself mean that the term is ambiguous."). Even if a provision
in a contract is ambiguous, the court may resolve the ambiguity as
a matter of law if the facts of the case are not in dispute. *See*
*Strama*, 793 So.2d at 1132. Ambiguous terms "should be resolved in
favor of upholding the purpose of the agreement and giving effect
to every term in the agreement." *City of Homestead*, 760 So.2d at
83.

Section 2 of the Franchise Agreement gives SSC the right to
sell, service, repair and maintain "Detection Devices, Tags,
Accessories and Supplies for Automatic Theft Detection Uses."
Detection Devices are defined as:

> [T]he detection systems and devices presently
> being marketed by the Franchisor for Automatic
> Theft Detection Uses (known as the Sensormatic
> System, and including the DoubleChecker),
> which include a transmitter and coordinated
> receiver and alarm console, and which may be
> installed and used as a system or device to
> activate and detect Tags, sounding an alarm or
> otherwise activating a control device, and all
> successors thereto.

§ 1(a). Tags are defined as "tags, labels, sensors, transponders
and sensor-emitters and the like, marketed by the Franchisor for
Automatic Theft Detection Uses, which may be attached to or

included in the merchandise, goods, articles and objects for use in conjunction with Detection Devices." § 1(b).

SSC relies on the "marketed by" language in § 1(a) and § 1(b) to assert that RFID products are within the scope of the franchise agreement if Sensormatic markets an RFID product for theft-related purposes. SSC then presents evidence that Sensormatic sales materials identify theft protection, such as the prevention of shoplifting and employee theft, as among the advantages of its RFID products, *see* (paper 106, exs. C, J, K, M, O), and presents evidence that major customers of RFID products (e.g. CVS, Hewlett Packard, Kimberly-Clark, and Procter & Gamble) regard theft detection as an important use of RFID products. *See* (paper 106, exs. JJ, KK, LL, MM, OO, PP).

SSC further argues that RFID products are successors to the Automatic Theft Detection Uses that Sensormatic marketed when the Franchise Agreement was signed. (Paper 106, at 26). Quoting § 1(a) of the Franchise Agreement, SSC asserts that a successor product is a product "*marketed* by the Franchisor for Automatic Theft Detection Uses." § 1(a)(emphasis added). "RFID may represent a new technology to some extent, but it is a successor product covered by the franchise because it is marketed for Automatic Theft Detection Uses." (Paper 106, at 26).

Sensormatic responds that SSC misreads the Franchise Agreement by emphasizing the "marketed by" language. Instead, Sensormatic

contends that the guiding language is in § 2(a) ("Detection Devices, Tags, Accessories and Supplies for Automatic Theft Detection Uses . . . ."). Thus, SSC must show that an RFID product is (1) a "Detection Device" and (2) that the RFID product is sold for "Automatic Theft Detection Uses." (Paper 108, at 20).

Sensormatic also disputes SSC's definition of what a successor product is. Sensormatic argues that to be within the scope of the Franchise Agreement, an RFID product must be a successor specifically to the 1976 Sensormatic System. (Paper 108, at 20). Relying on the *Random House Webster's Unabridged Dictionary*, Sensormatic asserts that to be a successor, a product must (1) come later in time and (2) replace the Sensormatic System. Because the evidence shows that the RFID products did not replace the Sensormatic System or any other later-generation Sensormatic EAS products, the RFID product is not a successor product, and therefore, is not within the scope of the Franchise Agreement.

In addition, Sensormatic contends that the RFID products at issue are not used for automatic theft detection purposes. (Paper 108, at 21). Sensormatic questions the evidence proffered by SSC that refers to "diversion," "manage theft," or reduce "shrinkage," stating "SSC's assumption seems to be that RFID products are covered by the franchise so long as they help contribute in some indirect way to the reduction of theft." *Id*. at 21. Sensormatic appears to argue that a product must do more than simply further

31

the chance of catching a thief.[9]  Sensormatic also contends that a
product must be "automatic" or without human intervention in order
to qualify as an automatic theft detection product, *id*. at 22,
however, RFID products, if they were used for theft detection, are
not automatic because the system would require an elaborate, labor-
intensive process.[10]  Finally, Sensormatic also presents evidence

---

[9]  Sensormatic points out that the court's ruling in the
Pennsylvania case specifically held that access control devices and
burglar alarms were not within the scope of the franchise agreement
because "these systems do not focus directly on 'shoplifting and
other theft,' or on 'control and surveillance.'" (Paper 106, ex.
SS, at 19).

[10] Sensormatic explains:

> Whereas only tags on stolen items are read in
> an EAS set-up, all tags on all pallets and
> cases are read in an RFID supply-chain
> process. Data capture is the name of the RFID
> game. Without it, supply-chain visibility is
> impossible.  Thus, the mere detection of the
> tag is not a theft detection.  Rather, to
> achieve the purported theft-detection benefit
> would require many additional steps involving
> software products neither manufactured nor
> sold by Sensormatic.  The data would need to
> be funneled into the enterprise's back-office
> systems.  Complex software programs then would
> sift through massive amounts of data possibly
> to reveal exceptions, such as a shipment that
> failed to arrive as expected.  Armed with such
> information, the enterprise then could conduct
> an investigation to determine the reason for
> the missing shipment – whether it was
> misdirected somewhere else, it spoiled, it was
> lost, or suffered some other fate.  Absent
> some other explanation, theft might be the
> cause, requiring further investigation into
> who was responsible by consulting employee
> roster, interviewing employees, reviewing
>                                    (continued...)

that none of its customers actually uses RFID products for automatic theft detection. *Id.* at 24. In short, Sensormatic argues that the fact that RFID products are marketed for automatic theft detection purposes is insufficient; RFID products must actually be sold and used for automatic theft detection purposes to be within the scope of the Franchise Agreement. *Id.* at 25.

The parties' contentions present both questions of law (i.e. contract interpretation) and questions of fact. With respect to contract interpretations, the parties dispute whether a product must be "marketed by" or actually used for theft detection purposes. The parties also dispute the meaning of the term "successor." The parties disagree as to the term "automatic." The questions of fact include whether the RFID products are indeed successor products and whether they are marketed and/or used for automatic theft detection purposes.

The court agrees with Sensormatic that "use" rather than "marketed by" is the relevant language. The franchise grant expressly states that SSC has an exclusive right to sell detection devices, tags, accessories and supplies "for automatic theft detection uses." § 2. This section makes no reference to

---

[10](...continued)
surveillance records, and other investigative techniques. This is an investigation that easily could last days, weeks, or months.

(Paper 108, at 23)(internal citations omitted).

marketing.   Although § 1(a) provides a definition for detection devices, the actual grant lies within § 2.   Moreover, the definition for "Automatic Theft Detection Uses" makes no reference to marketing, but only to "uses for the prevention and detection of shoplifting and other theft."  § 1(e).  The language in § 1(a) of "presently being marketed" identifies the types of detection system and device that were within the scope of the Franchise Agreement when the parties signed it in 1976.   But there is no language in the contract to suggest that future products would qualify as long as they are marketed for automatic theft detection uses.   Rather, future products are covered by the "all successors thereto" language, which makes no reference to marketing.[11]

Turning to the dispute over "successor," the Franchise Agreement provides no definition for this term.   The court, therefore, "may look to the dictionary to determine the plain and ordinary meaning of the word." *Rosenhaus v. Star Sports, Inc*., No. 3D06-189, __ So.2d __, 2006 WL 1148565, at *3 (Fla.Dist.Ct.App. Apr. 26, 2006); *see also Tarafa v. Takach,* Nos. 3D03-3127, 3D03-1310, __ So.2d __, 2005 WL 3409588, at *1 (Fla.Dist.Ct.App. Dec. 14, 2005)(relying on the dictionary to define an undefined term in a settlement agreement); *Travelers Indem. Co. v. PCR Inc*., 889 So.2d 779, 789 n.2 (Fla. 2004)(relying on the dictionary to

---

[11] The court disagrees with Sensormatic's argument that to be within the scope of the Franchise Agreement, a product must be a successor to the 1976 Sensormatic System specifically.

define the "plain meaning" of an insurance policy term).   The
Supreme Court of Florida and other appellate courts often rely on
*Webster's Third New International Dictionary*.[12] *See, e.g., Rosenhaus
v. Star Sports, Inc.*, 2006 WL 1148565, at \*3; *Travelers Indem. Co.*,
889 So.2d at 789 n.2. *Webster's Third New International Dictionary*
defines successor as "one that follows."   Webster's Third New Int'l
Dictionary 2282 (1986).   The court also looks to Florida courts
that have interpreted the word "successor."   They have defined
successor as: "One succeeds who follows *or* takes the place another
has left and sustains the like part or character."   *Ward v.
Okaloosa County Gas Dist.*, 99 So.2d 248, 252 (Fla.Dist.Ct.App.
1957)(quoting Black's Law Dictionary (4th ed. 1951)(emphasis
added)).   *See also Argonaut Ins. Co. v. Comm. Standard Ins. Co.*,
380 So.2d 1066 (Fla.Dist.Ct.App. 1980)(defining successor as "he
that followeth or cometh in another's place" and one "'who follows
or takes the place another has left and sustains the like part of
character.'" (quoting *Beatty v. Ross*, 1 Fla. 198, 209 (1847) and
*Ward*, 99 So.2d at 252).

This definition – that a successor program follows in time but
does not necessarily replace it – makes sense in light of § 1(a)
and the Franchise Agreement as a whole.   Because the description of

_____

[12]   SSC accurately notes that there are many dictionary
definitions for the word "succeed." (Paper 111, at 8).   *Webster's
Third New International Dictionary* is cited by Florida courts much
more frequently than the *Random House Webster's Unabridged
Dictionary*, on which Sensormatic relies.

detection systems and devices is broad (in that it does not refer to any single product), it is reasonable to interpret "successor" as having a broader definition that does not limit application to the question of whether one product replaced another.  Moreover, the Franchise Agreement envisions a long period of commitment ("so long as the Franchisor shall be engaged in the business of manufacturing and marketing Equipment").  Thus, the intent of the parties was to ensure that future products – not necessarily those products that specifically replaced products in use in 1976 – would be within the scope of the franchise.  Finally, because the EAS systems that existed in 1976 are still in existence, albeit with newer technology, accepting Sensormatic's definition would mean that virtually no product currently on the market could be a successor because such products have not replaced EAS.

Finally, the court disagrees with Sensormatic's argument that an RFID product must be "automatic" and "automatic" means without human intervention or because the system as a whole requires an elaborate process.  Other than relying on the word "automatic," there is no language within the definition section or elsewhere in the Franchise Agreement to suggest that a product must be devoid of human intervention or that it cannot be part of a bigger system.

Thus, an RFID product must (1) fit the definition of a "Detection Device" and (2) be sold for "Automatic Theft Detection Uses" to be within the scope of the Franchise Agreement.  The RFID

36

product must also follow in time to be a successor product, but it need not necessarily be a replacement product.  Whether a product relies on human assistance or is part of an elaborate, labor-intensive process is irrelevant.

SSC has presented uncontroverted evidence that the RFID products satisfy the term "Detection Devices," which is defined as "detection systems and devices . . . which include a transmitter and coordinated receiver and alarm console, and which may be installed and used as a system or device to activate and detect Tags, sounding an alarm or otherwise activating a control device". § 1(a).  SSC proffers evidence that RFID technology includes a transponder (typically called a "tag") that contains information concerning the object in which it is embedded, and it has a receiver/transmitter that communicates with the tags and activates a computer console that captures and processes the information received.  *See* (paper 106, ex. C, Reynolds dep., 98-99, Dec. 16, 2004; ex. D).  Sensormatic does not dispute this evidence.  SSC also presents evidence that Sensormatic viewed the RFID product as a successor product.  *See* (paper 106, ex. BB, Dunn dep., 145, 148, Dec. 14, 2004; ex. CC; ex. DD).  Sensormatic responds with evidence that it is not selling RFID products as a replacement product for EAS products (paper 108, Reynolds dec., ¶ 9; Billo dep., 142-144, Apr. 21, 2005).  As stated above, the replacement issue is irrelevant to the analysis.

SSC points to no evidence in the record of this case, however, that the RFID products at issue are being sold or used for Automatic Theft Detection Uses.   Instead, it contends that Sensormatic admitted that RFID products "are for Automatic Theft Detection Uses" in the Pennsylvania litigation, and that the admission may be considered evidence in this case.   There is a difference between an attorney's concession in the course of a different case, and a party's factual admission that can be used as evidence.   For example, in *Fidelity & Deposit Co. of Maryland v. Hudson United Bank*, 653 F.2d 766, 777 (3d Cir. 1981), the court discussed the difference:

> Schroeder's answer to the interrogatory qualifies as an admission of the Bank and was therefore properly admitted into evidence during the F&D trial. *See Bauman v. Royal Indemnity Co.*, 36 N.J. 12, 18, 174 A.2d 585, 588 (1961). We note that we are not concerned here with a "judicial admission," which involves a concession on the part of one party that a proposition of fact alleged by an opposing party is true, see 4 Wigmore, Evidence § 1058 (Chadbourn ed. 1972), and which is binding in the action in which it is made. *See Glick v. White Motor Co.*, 458 F.2d 1287 (3d Cir. 1972). Instead, we are concerned with a statement made by the Bank in connection with other litigation that is adverse to, or inconsistent with, its position in this case. As such, the answer to the interrogatory, although not conclusive, is admissible as evidence against the Bank to be weighed with all the other evidence by the trier of fact. *See, e. g., Bauman*, 36 N.J. at 18, 174 A.2d at 588; *Stoelting v. Hauck*, 32 N.J. 87, 159 A.2d 385 (1960). The answer to the interrogatory was admitted into evidence and considered by the district court in the

F&D trial. The Bank does not argue that admitting the interrogatory answer was error; it argues that the district court misinterpreted New Jersey law to the extent it further used this interrogatory to hold that the Bank was estopped from claiming that it did not discover employee dishonesty until after the effective date of the F&D bond. We agree.

SSC does not argue that the concession in the Pennsylvania litigation amounts to a judicial admission binding in this case,[13]

---

[13] The circumstances are inappropriate for application of the doctrine of "judicial estoppel" as formulated by the Fourth Circuit:

Judicial estoppel precludes a party from adopting a position that is inconsistent with a stance taken in prior litigation. *United Virginia Bank v. B.F. Saul Real Estate Investment Trust*, 641 F.2d 185, 190 (4th Cir. 1981). The purpose of the doctrine is to prevent a party "from playing 'fast and loose' with the courts, and to protect the essential integrity of the judicial process." *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982). Even so, courts must apply the doctrine with caution. *Allen*, 667 F.2d at 1167. The "determinative factor" in the application of judicial estoppel is whether the party who is alleged to be estopped "intentionally misled the court to gain unfair advantage." *Tenneco Chemicals v. William Burnett & Co.*, 691 F.2d 658, 665 (4th Cir. 1982). The vice which judicial estoppel prevents is the cold manipulation of the courts to the detriment of the public interest. It is inappropriate, therefore, to apply the doctrine when a party's prior position was based on inadvertence or mistake. *Johnson Service Co. v. Transamerica Ins. Co.*, 485 F.2d 164, 175 (5th Cir. 1973); *accord Konstantinidis v. Chen*, 626 F.2d 933, 939 (D.C.Cir. 1980).

(continued...)

and the court has rejected its collateral estoppel argument.  It has not proffered any evidence of a factual admission by Sensormatic in the earlier case, such as in interrogatory answers or otherwise.  Rather, it points only to a statement in the court's decision, reciting the litigating position stated by counsel in argument.  It is not evidence against Sensormatic in this case.

Sensormatic argues that no companies currently are using RFID products for Automatic Theft Detection Uses and proffers the following evidence.  Michael Epstein, the president of SSC, was asked in a deposition whether he was aware of any Sensormatic RFID product being used for automatic theft detection.  He answered: "I'm not aware."  (Paper 108, Epstein dep., 61, Dec. 14, 2004). Yossi Sheffi, an expert on supply chain management, stated that Wal-Mart, which has used RFID products in 104 stores, 36 Sam's Clubs and three distribution centers, has not identified theft detection as a benefit of RFID products.  (Paper 108, Sheffi dec., ¶¶ 18-29).  Randal Dunn, national sales and marketing director for RFID at ADT, stated that "ADT has not sold any RFID products to prevent or detect shoplifting."  (Paper 108, Dunn dec., ¶ 12).

SSC does not dispute this evidence.  Instead, in its reply memorandum, SSC asserts that because customers have purchased

---

[13](...continued)
*John S. Clark Co. v. Faggert & Frieden, P.C.*,  65 F.3d 26, 28-29 (4th Cir. 1995).

Sensormatic's RFID products for use in inventory control, they are using them for Automatic Theft Detection Uses as defined in § 1(e).[14] (Paper 111, at 13). Inventory control is just an example, however, of a setting in which a product may be used. Section 1(e) plainly requires that a product be used "for the prevention and detection of shoplifting and other theft." Thus, if a customer used RFID products for preventing and detecting shoplifting and other theft during the inventory control process, such a use may satisfy the definition of Automatic Theft Detection Uses. But merely asserting that an RFID product is part of inventory control

---

[14]     Section 1(e) defines Automatic Theft Detection Uses as:

> [U]ses for the prevention and detection of shoplifting and other theft and includes, but is not limited to, the following uses:
>      (i) The control and surveillance of inventory and merchandise offered for resale by retailers, wholesalers, manufacturers, government agencies and others;
>      (ii) The control and surveillance of tools, machinery, materials, and equipment used by manufacturers, wholesalers, retailers, service enterprises, government agencies and others'
>      (iii) The control and surveillance of books, manuscripts, films, recordings, and works of art in libraries, museums, galleries and similar institutions and in government agencies; and
>      (iv) The control and surveillance of merchandise and other goods and materials in freight terminals and other warehouses.

is insufficient to satisfy the definition of Automatic Theft Detection Uses. Because SSC has failed to proffer any evidence, much less uncontroverted evidence, that the RFID products are being used for Automatic Theft Detection Uses, it has failed to show as a matter of law that RFID products are within the scope of the Franchise Agreement. Accordingly, SSC's motion for summary judgment on its claim that RFID products are within the scope of its franchise will be denied.

**C. Sensormatic's Cross-Motion for Summary Judgment**

Sensormatic has cross-moved for summary judgment, asserting that "RFID products do not trigger SSC's franchise rights." (Paper 108, at 30). Count II alleges breach of contract for refusing to allow SSC to sell Sensormatic's RFID products. The uncontroverted evidence on this record is that RFID products are not used for Automatic Theft Detection uses and thus not within the scope of SSC's franchise. Accordingly, the court will grant summary judgment in Sensormatic's favor. Count III asserts breach of contract for authorizing ADT to sell and service "access control products and systems" and RFID products and systems. (Paper 18, ¶ 17). The court previously issued an Order dismissing Count III as it pertains to access control devices. (Paper 30). Moreover, RFID products are not within the scope of the Franchise Agreement, and accordingly, Sensormatic will be granted summary judgment on Count III.

**D.   ADT'S Motion for Summary Judgment on Count IV**

ADT seeks summary judgment in its favor on the tortious interference with contract claim. (Paper 107). This claim involves sales of RFID products. *See* (paper 18, ¶¶ 59-60). The elements of tortious interference with contract under Maryland law are:

> (1) existence of a contract between plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional interference with that contract; (4) breach of that contract by the third party; and (5) resulting damages to the plaintiff.

*Fowler v. Printers II, Inc.*, 598 A.2d 794, 802 (Md.App. 1991) (internal citations omitted). Because SSC cannot show that Sensormatic breached the Franchise Agreement by allowing ADT to sell RFID products, which are not within the scope of the Franchise Agreement, SSC cannot satisfy the elements for a tortious interference claim. Accordingly, ADT's motion for summary judgment on Count IV will be granted.

**V. Motions to Seal**

SSC, Sensormatic and ADT have filed several motions to seal documents pursuant to Local Rule 105.11. (Papers 109, 110, 114). Local Rule 105.11 provides:

> Any motion seeking the sealing of pleadings, motions, exhibits or other papers to be filed in the Court record shall include (a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protections. The

Court will not rule upon the motion until at
least 14 days after it is entered on the
public docket to permit the filing of
objections by interested parties. Materials
that are the subject of the motion shall
remain temporarily sealed pending a ruling by
the Court. If the motion is denied, the party
making the filing will be given an opportunity
to withdraw the materials.

There is a well-established common law right to inspect and copy

judicial records and documents. *See Nixon v. Warner Commc'ns,

Inc.,* 435 U.S. 589, 597 (1978). If competing interests outweigh

the public's right of access, however, the court may, in its

discretion, seal those documents from the public's view. *See In re

Knight Publ'g Co.,* 743 F.2d 231, 235 (4th Cir. 1984).

Furthermore, prior to sealing any documents, the court must

provide notice of counsel's request to seal and an opportunity to

object to the request before the court makes its decision. *See

Knight,* 743 F.2d at 235.[15] Either notifying the persons present in

the courtroom or docketing the motion "reasonably in advance of

deciding the issue" will satisfy the notice requirement. *Id.*

Finally, the court should consider less-drastic alternatives, such

as filing redacted versions of the documents. If the court decides

that sealing is appropriate, the court should provide reasons,

---

[15] Although the court must provide notice prior to making a
decision to seal, it is appropriate temporarily to seal documents
while the underlying motion to seal is under consideration. *See
Knight*, 743 F.2d at 235, n.1.

supported by specific factual findings, for its decision to seal
and for rejecting alternatives.  *Id.*

The documents that the parties seek to seal involve memoranda,
depositions, contracts, and other business records.  Specifically,
in Paper 109, Sensormatic and ADT seek to seal (1) Sensormatic's
Memorandum in Support of Cross-Motion For Summary Judgment and
Opposition to Plaintiff SSC's Motion for Partial Summary Judgment;
(2) ADT's Memorandum in Support of Motion for Summary Judgment; and
(3) Defendants' one-volume appendix containing exhibits.    In
addition, Defendants ask the court to file under seal or to order
SSC to file under seal (1) Plaintiff's Memorandum in Support of
Motion for Partial Summary Judgment and (2) Plaintiff's one-volume
appendix containing exhibits.[16]  (Paper 109).  In addition, in Paper
114, Sensormatic seeks to file under seal its Reply in Support of
its Cross-Motion for Summary Judgement.  These motions to seal do
not offer "specific factual representations" to justify the
sealing.    The only justification for sealing offered by the
Defendants is the existence of a joint confidentiality order.
Characterizing documents as "confidential" without any explanation
as to why the information should be protected does not satisfy the
"specific factual representations" that Local Rule 105.11 requires.

---

[16] Defendants assert that SSC failed to file its memorandum and
exhibits under seal, as required by the confidentiality order.

In Paper 110, SSC seeks to file under seal its Reply in Support of SSC's Motion for Partial Summary Judgment and exhibits UU and VV therein.  (Paper 110).  SSC explains that its reply memorandum makes reference to and quotes from two documents that were designated "confidential" in the Pennsylvania case, and asks that these items be sealed in order to preserve the confidentiality.  (Paper 110, at 2).  SSC provides no explanation as to why the entire reply memorandum must be sealed in order to maintain the confidentiality of exhibits UU and VV.

Because the parties have failed to comply with Rule 105.11, the court will deny their motions to seal.  SSC, Sensormatic, and ADT will have 15 days to renew their motions with memoranda that comply with Rule 105.11.  In the meantime, those papers that already are temporarily under seal will remain under seal.  If the parties do not renew their motions, the papers will be unsealed.

## VI. Conclusion

For the foregoing reasons, the court will grant SSC's motion for summary judgment and deny Sensormatic's motion for summary judgment on Sensormatic's counterclaim; will deny SSC's motion for summary judgment; will grant in part Sensormatic's motion for summary judgment; will grant ADT's motion for summary judgment on

46

the count against it (Count IV); and will deny SSC, Sensormatic,

and ADT's motions to seal.[17]   A separate Order will be entered.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge

---

[17] Because the court previously issued an Order dismissing
Count I and the portion of Count III dealing with access control
devices (paper 30), no more issues remain.